State, ex rel. Packard, v. Nelson.

STATE, EX REL. J. L. PACKARD, V. FRANK NELSON.

[FILED MARCH 9, 1892.]

Counties: DIVISION: VOTE REQUIRED: CONSTITUTIONAL LAW. The provisions of section 2, art. 10, of the constitution, which delares that "No county shall be divided or have any part stricken therefrom without first submitting the question to a vote of the people of the county, nor unless a majority of all the legal voters of the county voting on the question shall vote for the same," is a restriction upon the powers of the legislature to the extent named, but is not a prohibition upon that power to require more than a majority in favor of the proposition—as three-fifths of the legal votes cast upon that question.

ORIGINAL application for *mandamus.*

*Leese & Stewart*, for relator:

Where the constitution defines the circumstances under which a right may be exercised, the specification is exclu-

sive. (Cooley, Constitutional Limitations, p. 78.) The legislature cannot add to the constitutional qualifications of voters. (*State v. Baker*, 38 Wis., 86; *Monroe v. Collins*, 17 O. St., 665; *State v. Symonds*, 57 Me., 148; *Lowe v. Com.*, 3 Met. [Ky.], 237.) Nor can it provide for the choice of officers a different mode from that prescribed by the constitution. (*People v. Albertson*, 55 N. Y., 50; *Opinion of the Judges*, 117 Mass., 603.) See also, as illustrating the principle, *Baird v. Todd*, 27 Neb., 782; *State v. McLelland*, 18 Id., 241.

*Holmes & Hays, contra:*

The court cannot, by a proceeding of this kind, determine the constitutionality of an act of the legislature. (*State v. Commissioners of Douglas County*, 18 Neb., 506; *State v. Stevenson*, Id., 416.) Coming now to a discussion of the second point, we insist that the law referred to, sec. 11, art. 1, ch. 18, Comp. Stats., does not contravene the constitutional provision. (*Reineman v. C. C. & B. H. R. Co.*, 7 Neb., 311.) If it be true that the act of 1889 contravenes the constitution, then there is absolutely no law authorizing an election to be held upon the question. (*Key v. Goodwin*, 4 Moore & Payne [Eng.], 341; *Johnson v. Hand*, 4 Neb., 146; *Wilcox v. Saunders*, Id., 572; *State v. Musselman*, 20 Id., 174.)

MAXWELL, CH. J.

This is an original action brought in this court, the cause of action being set forth as follows:

"First—That he is a resident, elector, and taxpayer of Knox county, Nebraska, and resides in that portion of the county proposed to be erected in the county of Union, and that the defendant is now, and ever since January, A. D. 1890, has been, the duly elected, qualified, and acting county clerk of said Knox county.

"Second—That on the 15th day of July, 1890, for the

purpose of forming the new county of Union out of the county of Knox, comprising the two southern tiers of townships of said county, a petition signed by more than a majority of the legal voters residing in the territory proposed to be stricken from Knox county was duly presented to the county board of said Knox county, that being the only county affected by such division, and it appearing to the county board that said new county of Union could be constitutionally formed, the question of the erection of said new county of Union was at the next succeeding general election, to-wit, November 4, 1890, duly submitted to the vote of the people of said Knox county.

" Third—That plaintiff further alleges that at said general election held November 4, 1890, there were cast for state officers 2,131 legal votes, and no more; that of said number there were cast 1,146 ballots on the question of forming the new county of Union *for new county*, and 925 ballots on the question were cast *against new county.*

"Fourth—That 221 ballots more than a majority of all the legal voters of the county voting on the question voted for the division of said Knox county and for the erection of the new county of Union.

"Fifth—That all of said votes were properly canvassed and returned, made as required by law, except the votes cast on the question of forming the county of Union.

"Sixth—That the defendant county clerk has failed, neglected, and refused to certify the number of votes cast on the question to the secretary of state, together with the name, territorial contents, and boundaries of such new county of Union, although often requested to do so, and the only reason or excuse given by the defendant why he refuses to so certify to the secretary of state is because the total number of votes cast for new county at said election does not equal three-fifths of all the votes cast at such election, and that a majority of all the votes cast at said election on the question of the erection of said new county

is not sufficient in numbers to require him to make the certificate to the secretary of state, and for this reason alone he has refused.

"Seventh—Your petitioner alleges that section 2 of article 10 of the constitution provides that no county shall be divided without first submitting the question to a vote of the people of the county, nor unless a majority of all the legal voters of the county voting upon the question shall vote for the same.

"Eighth—That the legislature in 1889 enacted a law to amend section 11 of article 1 of chapter 18 of Compiled Statutes of 1887, by requiring three-fifths of all the votes cast at a general election to be in favor of dividing a county before the same could be divided, but your petitioner alleges that said act of 1889, known as section 2 of chapter 5, Laws of 1889, contravenes section 2 of article 10 of the constitution and is unconstitutional and void, and that the act of 1879, carrying into effect the provisions of section 2 of article 10 of the constitution, is still in full force and effect, and by the provisions of said act of 1879 the number of votes required to divide a county was that provided by the constitution, to-wit, a majority of all the votes cast on the question, and no more.

"Ninth—That under the provision of said act of 1879 it is made the duty of the county clerk to certify to the secretary of state the number of votes cast on the question, the name, the territorial contents and boundaries of a new county, if it shall appear that a majority of all the votes cast on the question of division is in favor of the erection of the new county. This duty the defendant refuses to do.

"Wherefore the plaintiff prays that a peremptory writ of *mandamus* may issue out of this court commanding said defendant forthwith to certify to the secretary of the state the number of votes cast for new county, and against new county, together with the name, territorial contents, and boundaries of such new county of Union, and for costs of suit."

To the petition a general demurrer is filed and the cause is now submitted on the demurrer.

Section 1, article 10, of the constitution provides:

" No new county shall be formed or established by the legislature which will reduce the county or counties, or either of them, to a less area than 400 square miles, nor shall any county be formed of a less area.

" Sec. 2. No county shall be divided or have any part stricken therefrom without first submitting the question to a vote of the people of the county, nor unless a majority of all the legal voters of the county voting on the question shall vote for the same.

" Sec. 3. There shall be no territory stricken from any organized county, unless a majority of the voters living in such territory shall petition for such division, and no territory shall be added to any organized county without the consent of a majority of the voters of the county to which it is proposed to be added; but the portion so stricken off or added to another county, or formed in whole or in part into a new county, shall be holden for and obliged to pay its proportion of the indebtedness of the counties from which it has been taken."

Chap. 18, art. 1, Compiled Statutes provides:

" The boundaries of the several counties of this state shall remain as they are established until the same be changed according to law."

" Sec. 4. When a majority of the legal voters residing upon any territory shall petition the county board of their own county, and also of the county to which they desire such territory to be transferred, for leave to have such territory transferred to such county, it shall be the duty of the several county boards so petitioned to submit the question at the next general election in said counties; *Provided,* That no such petition shall be granted until after the expiration of three years from the last submission of the question.

"Sec. 5. Notices of such election shall contain a description of the territory proposed to be transferred, the names of the counties from and to which such transfer is intended to be made, and shall be posted with the other notices for general elections.

"Sec. 6. The ballots used in the said elections may be in the following form, to-wit, 'For transferring territory,' and 'Against transferring territory,' when, if a majority of the voters voting upon said question in the county from which said territory is proposed to be taken, and a majority of the voters of the county to which the same is proposed to be transferred, shall be 'For transferring territory,' then the said territory shall be transferred to and become a part of the county to which it is proposed to transfer the same on and after the first day of January succeeding such election, and shall be subject to all the laws, rules and regulations thereof; *Provided*, That all assessments and collection of taxes and judicial or other official proceedings commenced prior to said first day of January shall be continued, prosecuted, and completed in the same manner as if no transfer had been made; *And provided further*, That all township or precinct officers within said transferred territory shall continue to hold their respective offices within the county to which they may be transferred until their respective terms of office expire.

"Sec. 7. No county shall be reduced, under the provisions of this act, to less contents than 400 square miles.

"Sec. 10. Whenever it is desired to form a new county out of one or more of the then existing counties, and a petition praying for the erection of such new county, stating and describing the territory proposed to be taken for such new county, together with the name of such proposed new county, signed by a majority of the legal voters residing in the territory to be stricken from such county or counties, shall be presented to the county board of each county to be affected by such division, and it appearing that such new

county can be constitutionally formed, it shall be the duty of such county board or county boards to make an order providing for the submission of the question of the erection of such new county to a vote of the people of the counties to be affected, at the next succeeding general election of which the notice shall be given, the votes canvassed and the returns made as in case of election of county officers, and the form of the ballot to be used in the determination of such question shall be as follows: 'For new county' and 'Against new county.'

"Sec. 11. If it shall appear that three-fifths of all the votes cast at such election in each of the counties interested is in favor of the erection of such new county, the county clerk of each of said counties shall certify the same to the secretary of state, stating in such certificate the name, territorial contents, and boundaries of such new county; whereupon the secretary of state shall notify the governor of the result of such election, whose duty it shall be to order an election of county officers for such new county, at such time as he shall designate, and he may, when necessary, fix the place of holding elections, notice of which shall be given in such manner as the governor shall direct. At such election the qualified voters of said new county shall elect all county officers of said county, except as hereinafter excepted, who shall be commissioned and qualified in the same manner as such officers are in other counties in the state, and who shall continue in office until the next general election for such officers and until their successors are elected and qualified, and who shall have all the jurisdiction and perform all the duties which are or may be conferred upon such officers in other counties of this state."

The principal contention of the relator is that the constitution fixes the maximum number of voters necessary to divide a county and there is no power in the legislature to change the ratio so fixed, and, therefore, that the sections of the statute above copied, in so far as they provide for a

three-fifths vote of the electors to effect a division of a county, are void. To this proposition we cannot give our assent. Judge Cooley, in his valuable work on Constitutional Limitations (6th Ed., pp. 104–106), in speaking of the power of a state legislature, says:

"There are two fundamental rules by which we may measure the extent of the legislative authority in the states:

" First—In creating a legislative department and conferring upon it the legislative power, the people must be understood to have conferred the full and complete power as it rests in and may be exercised by the sovereign power of any country, subject only to such restrictions as they may have seen fit to impose, and to the limitations which are contained in the constitution of the United States. The legislative department is not made a special agency for the exercise of specifically defined legislative powers, but is entrusted with the general authority to make laws at discretion.

" Second—But the apportionment to this department of legislative power does not sanction the exercise of executive or judicial functions, except in those cases, warranted by parliamentary usage, where they are incidental, necessary, or proper to the exercise of legislative authority, or where the constitution itself, in specified cases, may expressly permit it. Executive power is so intimately connected with legislative that it is not easy to draw a line of separation; but the grant of the judicial power to the department created for the purpose of exercising it must be regarded as an exclusive grant, covering the whole power, subject only to the limitations which the constitutions impose and to the incidental exceptions before referred to. While, therefore, the American legislatures may exercise the legislative powers which the parliament of Great Britain wields, except as restrictions are imposed, they are at the same time excluded from other functions which may be, and sometimes habitually are, exercised by the parliament."

"The people in framing the constitution," says Denio, Ch. J., "committed to the legislature the whole law-making power of the state, which they did not expressly or impliedly withhold. Plenary power in the legislature, for all purposes of civil government, is the rule. A prohibition to exercise a particular power is an exception. In inquiring, therefore, whether a given statute is constitutional it is for those who question its validity to show that it is forbidden. I do not mean that the power must be expressly inhibited, for there are but few positive restraints upon the legislative power contained in the instrument. The first article lays down the ancient limitations, which have always been considered essential in a constitutional government, whether monarchial or popular; and there are scattered through the instrument a few other provisions in restraint of legislative authority. But the affirmative prescriptions and the general arrangements of the constitution are far more fruitful of restraints upon the legislature. Every positive direction contains an implication against anything contrary to it, or which would frustrate or disappoint the purpose of that provision. The frame of the government, the grant of legislative power itself, the organization of the executive authority, the erection of the principal courts of justice, create implied limitations upon the law-making authority as strong as though a negative was expressed in each instance; but independently of these restraints, expressed or implied, every subject within the scope of civil government is liable to be dealt with by the legislature."

"It has never been questioned, so far as I know," says Redfield, Ch. J., "that the American legislatures have the same unlimited power in regard to legislation which resides in the British parliament, except where they are restrained by written constitutions. That must be conceded, I think, to be a fundamental principle in the political organizations of the United States. We cannot well com-

prehend how, upon principle, it should be otherwise. The people must, of course, possess legislative power originally. They have committed this in the most general and unlimited manner to the several state legislatures, saving only such restrictions as are imposed by the constitution of the United States, or of the particular state in question." (*Thorpe v. Rutland & Burlington R. Co.*, 27 Vt., 140–2; *Adams v. Howe*, 14 Mass., 340; S. C., 7 Am. Dec., 216; *People v. Rucker*, 5 Col., 455; *People v. Osborne*, 7 Id., 605; *Leggett v. Hunter*, 19 N. Y., 445; *Cochran v. Van Surlay*, 20 Wend. [N. Y.], 365; *People v. Morrell*, 21 Id., 563; *Sears v. Cottrell*, 5 Mich., 251; *Beauchamp v. State*, 6 Blackf. [Ind.], 299; *Mason v. Wait*, 5 Ill., 127; *People v. Supervisors*, 27 Barb. [N. Y.], 575; *Taylor v. Porter*, 4 Hill [N. Y.], 140; *State v. Reid*, 1 Ala., 612; 35 Am. Dec. [N. Y.], 44; *Andrews v. State*, 3 Heisk. [Tenn.], 165; *Knoxville, etc., R. Co. v. Hicks*, 9 Baxt. [Tenn.], 442; *Lewis's Appeal*, 67 Pa. St., 153; *Walker v. Cincinnati*, 21 O. St., 14; *People v. Wright*, 70 Ill., 388.)

That the rule as to the extent of legislative power is substantially the same in Canada, see *Valin v. Langlois*, 3 Can. Sup. Ct., 1; *Mayor, etc., v. The Queen*, Id., 505.

Judge Sutherland, in his work on Statutory Construction, sec. 8, states the rule in the same way and quotes from the case of *Slack v. Maysville R. Co.*, 13 B. Mon. [Ky.], 22: "It would be difficult, perhaps impossible, to define the extent of the legislative power of the state unless by saying that, so far as it is not restricted by the higher law of the state and federal constitutions, it can do everything which can be effected by means of a law. It is the great supervising, controlling, creative, and active power in the state, subject to the fundamental restrictions just referred to. Whatever legislative power the whole commonwealth has is, by the constitution, vested in the legislative department, which, representing the popular majorities in the several local divisions of the state, and under no other restraint but such

as is imposed by the fundamental law, by its own wisdom and its own responsibilities may regulate the conduct and command the resources of all for the safety, convenience, and happiness of all, to be promoted in such manner as its own discretion may determine. The legislative department performs and finishes its office by the mere enactment of a law."

That these authorities state the law correctly there is no question. In the absence of any restrictions in the constitution the legislature could divide counties in such manner as it saw fit. It could add to or take territory from any county. It has the power to create counties, and in the absence of constitutional restrictions could change the same at its pleasure. It is well known that this power was constantly exercised by the several legislatures of the territory of Nebraska. Thus in 1866 twelve sections were taken from Cass county and added to Saunders county. Prior to that time a county called Clay, which lay between Gage and Lancaster counties, was legislated out of existence and the territory added to Lancaster and Gage counties. Sarpy county was cut off from Douglas; the boundaries of Washington county were extended westward to take in Fontanelle in Dodge county; Colfax county was organized out of a part of Platte county. Many other cases could be mentioned. In none of these cases were the people of the counties affected consulted, nor did they have any opportunity to express their preference either for or against a change. To guard against this abuse of power the constitution fixed certain limits to the division of counties. First—The new county must contain at least 400 square miles. Now, will any one contend that because the constitution has declared that the new county must contain at least a specific number of square miles that the legislature may not increase the number and require it to contain at least 500 or 600 square miles? No one will so contend. The object was to prevent the

cutting down of the territory of a county to such an extent as to render taxation for county purposes burdensome to the taxpayers of the county. So in regard to the provision for submitting the question of the formation of new counties to a vote of the people. In the absence of that provision no vote would be necessary; but to guard against the abuse of power the constitution, in effect, provides that the parties immediately interested shall determine the question, and that not less than a majority shall cause the formation of a new county. The legislature recognizes the restriction and makes no attempt to interfere with it, but adds to it by providing that at least three-fifths of the votes cast upon that question shall be necessary to effect the division. That this is within the powers of that body there is no doubt, and as the petition shows that less than three-fifths of the votes were cast for the new county the writ must be denied. The demurrer is therefore sustained and the action

DISMISSED.

THE other judges concur.